2011 UT App 1

**STATE of Utah, Plaintiff and Appellee,**

v.

**Sherman Alexander LYNCH, Defendant and Appellant.**

No. 20090628–CA.

Court of Appeals of Utah.

Jan. 6, 2011.

Linda M. Jones and Patrick W. Corum, Salt Lake City, for Appellant.

Mark L. Shurtleff and Ryan D. Tenney, Salt Lake City, for Appellee.

Before Judges DAVIS, THORNE, and ROTH.

OPINION

DAVIS, Presiding Judge:

¶ 1 Defendant Sherman Alexander Lynch appeals his convictions of murder, a first degree felony, see Utah Code Ann. § 76–5–203 (Supp.2010), and obstruction of justice, a second degree felony, see id. § 76–8–306, in connection with the death of his wife, Patricia Rothermich. We affirm.

## BACKGROUND

¶ 2 On October 3, 2007, Patricia was hit by a vehicle while she was on a walk near her home in Holladay, Utah. Shortly afterward, a passerby noticed her legs sticking out from some bushes and called emergency services, which dispatched paramedics at 3:18 p.m. to respond to the scene. Once there, paramedics noted that Patricia had severe head trauma, had a severe injury to her left calf, and was "barely sustaining life." Patricia went into cardiac arrest en route to the hospital and, despite paramedics' efforts to revive her, was pronounced dead on arrival.

¶ 3 An officer from the Salt Lake County Sheriff's Office responded to the scene of the incident and conducted the initial investigation. Based on the evidence at the scene, he concluded that Patricia had been struck from behind while walking against traffic. He also determined that based on the height and location of Patricia's injuries, the vehicle that had hit her had a high front end, such as a "truck or a van." The officer also noted that Patricia had some white paint on the back of her pants that appeared to have been transferred when she was struck by the vehicle. Finally, the officer found three broken zip ties in the roadway, which had fallen in a "consecutive" order that was "in line with the collision path." This evidence suggested to the officer that the zip ties "may have come off of a vehicle that was involved in this collision."

¶ 4 While the investigation at the scene continued, another officer went to Defendant's home. Defendant was not there when the officer arrived but came home shortly thereafter. According to the officer, Defendant appeared "nervous" and "a little distraught." After speaking with Defendant, the officer offered to take Defendant to the hospital.

¶ 5 Defendant's neighbor, Don Carter, had been notified of the incident and went to the hospital to meet Defendant. Carter later testified that Defendant's behavior at the hospital was "way over the top." Carter also testified that shortly after he arrived at the hospital, Defendant hugged him and "started to say, 'What have I,' then immediately corrected and said, 'What am I going to do?'"

Carter further testified that although it did not mean much to him at the time, the statement definitely "caught [his] ear."

¶ 6 In the days following the incident, Defendant spoke to local television reporters and made pleas to the public for help in finding the person who had hit and killed his wife. Nancy Scott, Defendant's girlfriend, saw Defendant on television talking about Patricia. Scott was "devastated" because she did not know Defendant was married. When Scott later called Defendant to inquire about his comments to the media, he told her that Patricia was actually his live-in landlord and that he referred to her as his wife on television to protect her image because they were living in the same household together.

¶ 7 After learning that police were looking for a white truck in connection with the hit-and-run, Scott contacted the police. Scott informed the police that she and Defendant had a relationship and that Defendant had purchased a white truck at the end of August. Scott also took the police to a storage garage in Holladay where Defendant had kept the truck. Although the truck was not there, officers found pieces of carpet with white spray paint on them. Officers also spoke with the owner of the garage, who confirmed that Defendant had kept the truck there during September and that Defendant had spray painted over some rust spots on the truck with white spray paint. The owner of the garage also told officers that during the last week of September he had asked Defendant to move the truck out of the garage.

¶ 8 A few days later, a different man called the police to report that in late September he had seen a white truck parked inside a garage near an abandoned home that he was renting for storage. When officers later went to the abandoned garage, they located the white truck. The vehicle identification number on the truck matched that of the truck that Defendant had purchased in August, and there was other evidence inside the truck showing that Defendant was, indeed, the owner of the vehicle. The officers also noted that the truck had evidence linking it to Patricia's death. First, the location and

type of damage on the truck was consistent with Patricia's injuries. Second, officers found a fragment of a zip tie in the engine compartment and noticed that the hood did not close properly, suggesting that the zip tie had been used to secure it. Finally, officers noticed that rust spots on the truck had been covered up with white spray paint.[1]

¶ 9 On October 8, 2007, Defendant was interviewed by police. During the interview, police asked Defendant whether he owned vehicles. Defendant admitted to owning a van but denied owning "any other vehicles" or making "recent purchases or sales of vehicles." Police then told Defendant that they were aware of the garage he had rented. Although Defendant first denied keeping any vehicles in the garage, he later admitted to buying a truck, which he claimed was for his teenaged son. When police inquired as to the truck's whereabouts, Defendant told them that the truck had broken down on the freeway and that Defendant had given the truck to a man who stopped to help him. After police told Defendant that they had the truck in their possession, Defendant was arrested for Patricia's murder. On October 10, 2007, Defendant was charged with one count of murder and one count of obstruction of justice in connection with Patricia's death.

¶ 10 At trial, Defendant presented an alibi defense. Specifically, he claimed that he had been at Costco in Murray buying milk and gas at the time Patricia was hit. In support of this claim, Defendant produced receipts showing that he was at Costco on October 3, 2007. The date stamps on the receipts and surveillance video from the store showed that Defendant had purchased gasoline at 3:44 p.m. and milk at 3:55 p.m. The State did not dispute that Defendant had made the Costco trip. Rather, the State presented evidence that Defendant had ample time to hit Patricia, drive the white truck to the abandoned garage, and then make it to Costco in time to make his purchases at 3:44 p.m. and 3:55 p.m.

¶ 11 During the trial, the jury received several instructions regarding burdens of proof in the case. Of the preliminary instructions given, Instructions 13 and 15 specifically instructed the jury that "[t]he prosecution has the burden of proof" and that "[t]he prosecution has the burden of proving [Defendant] was guilty beyond a reasonable doubt." The closing jury instructions similarly instructed the jury. Indeed, Instruction 14 stated, "[T]he burden is always on the prosecution to prove guilt beyond a reasonable doubt. This burden never shifts to the defendant for the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence." Instruction 21 stated that the jury could convict only if the State had proven Defendant guilty beyond a reasonable doubt, and Instruction 34 stated that Defendant could be found guilty only if the State had proven that Defendant had caused Patricia's death.

¶ 12 During closing argument, the prosecutor made the following statement to the jury regarding Defendant's interaction with Carter at the hospital after Patricia's death:

> And the other thing [Defendant] said was to a person he considered his best friend that goes to the hospital, that's there with him in his time of grief, and he walks up and the first thing he says [is, "]what have I—what am I going to do without her?["] What have I done?[ ] [2] He killed his wife.

---

1. A forensic specialist later compared the paint found on the white truck to paint that was found on Patricia's clothing after the collision. The specialist concluded that the paint found on Patricia's pants was of the "same distinct type" as the white spray paint found on Defendant's truck.

2. In the transcript of closing arguments, the opening quotation mark is located before the word "is." The State points out in its brief that this appears to be a transcription error because Carter's statement while he was testifying actually began with the word "what." Defendant also

apparently concedes this point, because he has corrected the quote accordingly in his brief. Given Carter's testimony at trial and Defendant's concession on appeal, we agree that the opening quotation mark belongs in front of the word "what" rather than the word "is."

Furthermore, the record contains an audio recording of closing arguments, which we reviewed for the limited purpose of verifying the accuracy of the placement of the closing quotation mark in the transcript. Having reviewed the recording, we agree with the State that there is a punctuation error. *See generally People v.*

He did it intentionally and then he tried to cover his tracks by hiding his truck in the garage. And we ask you to find him guilty on both counts.

After deliberating, the jury convicted Defendant on one count of murder and one count of obstruction of justice in connection with Patricia's death. Defendant now appeals.

## ISSUES AND STANDARDS OF REVIEW

¶ 13 Defendant argues that the trial court erred in failing to give a jury instruction regarding his alibi defense and that the prosecutor engaged in misconduct by making statements during closing argument implying that Defendant had confessed to the crime. Defendant failed to preserve these claims below, but he contends that this court may review his claims for plain error and manifest injustice. *See State v. Holgate,* 2000 UT 74, ¶ 11, 10 P.3d 346 (stating that unpreserved claims may be reviewed for plain error); *see also State v. Alinas,* 2007 UT 83, ¶ 10, 171 P.3d 1046 (stating that manifest injustice is generally synonymous with the plain error standard). Defendant also claims that trial counsel rendered ineffective assistance of counsel for failing to object to these alleged errors. "An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law." *State v. Clark,* 2004 UT 25, ¶ 6, 89 P.3d 162.

## ANALYSIS

I. Because an Alibi Defense Is Not an Affirmative Defense, the Trial Court Did Not Err in Failing to Give an Instruction in That Regard

¶ 14 Defendant argues that his alibi defense is an affirmative defense and, as a result, the trial court was required to "separately instruct [the] jury clearly that the State must disprove ... affirmative defens-

es[ ] beyond a reasonable doubt." *See State v. Garcia,* 2001 UT App 19, ¶ 16, 18 P.3d 1123. Defendant acknowledges that this claim was not preserved below but argues that plain error, manifest injustice, or ineffective assistance of counsel warrant reversal on appeal. In support of his claim that an alibi is an affirmative defense, Defendant points us to *State v. Waid,* 92 Utah 297, 67 P.2d 647, 651 (1937), and *State v. Saunders,* 82 Utah 170, 22 P.2d 1043, 1045–46 (1933), cases which stood for the proposition that an alibi defense is an affirmative defense. However, as correctly pointed out by the State, those cases were superseded when "[i]n an effort to rationalize, clarify, and improve upon the frequently archaic common law definitions of crimes, the legislature in 1973 repealed wholesale all the prior substantive criminal statutes ... and enacted a sweeping new penal code that departed sharply from the old common law concepts," *State v. Tuttle,* 730 P.2d 630, 632 (Utah 1986). Accordingly, *Waid* and *Saunders* no longer have the force of law because the 1973 codification of the criminal law abolished the common law of crimes, "including, necessarily, defenses." *Id.*

¶ 15 Defendant also cites to a number of cases decided by the supreme court after the 1973 codification of the criminal code. Although some of these cases contain language that is admittedly less clear on the question, we conclude that they have little applicability for two main reasons. First, to the extent that these cases refer to alibi as an affirmative defense, those references are merely dicta. *See, e.g., State v. Low,* 2008 UT 58, ¶ 28, 192 P.3d 867 (referring, in dicta, to "affirmative defenses[ ] such as a valid alibi or legitimate self-defense"); *State v. Knoll,* 712 P.2d 211, 214–15 (Utah 1985) (stating, in a case involving self-defense, and without any further analysis, that "the prosecution has

---

*Huggins,* 38 Cal.4th 175, 41 Cal.Rptr.3d 593, 131 P.3d 995, 1008 (2006) ("Although we rely upon the court reporter to accurately record the words spoken in court, we are not bound by the court reporter's interpretation of the speaker's intended meaning as shown by the punctuation inserted by the reporter."). In the transcript, the closing quotation mark is placed after the phrase, "What have I done?" thereby suggesting that the prosecutor was still quoting Defendant

at that point in her closing statement. However, given the lengthy pause between the sentences, it is clear that the quote the prosecutor ascribed to Defendant ended with "what am I going to do without her?" When the prosecutor then asked, "What have I done?" she was no longer quoting Defendant. Accordingly, we conclude that the closing quotation mark belongs after the word "her."

the same burden of proof[, i.e., beyond a reasonable doubt,] with respect to such defenses as lack of mental capacity and alibi"); *State v. Wilson*, 565 P.2d 66, 68 (Utah 1977) (stating, in the context of a sufficiency of the evidence claim, that an alibi defense is "on the same footing as other so-called defenses . . . such as, e.g., entrapment, self-defense, lack of mental capacity, or of criminal intent"). Second, these cases are directly contrary to other supreme court cases that have specifically concluded that "alibi is not an affirmative defense but merely a denial that [a defendant] was where he was said to be at the time the crime was committed," *see State v. Romero*, 554 P.2d 216, 219 (Utah 1976); *see also State v. Fulton*, 742 P.2d 1208, 1213 (Utah 1987) ("[A]n alibi defense . . . is not one that has merit independent of whether the State can prove the statutory elements of the crime; rather, an alibi defense challenges the State's ability to prove the statutory elements.").

 ¶ 16 We hold that an alibi defense is not a separate, affirmative defense that carries its own burden of proof. An affirmative defense is "[a] defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all the allegations in the complaint are true." *Black's Law Dictionary* 482 (9th ed. 2009). An alibi defense, on the other hand, is simply a refutation of the State's case-in-chief, that is, "an alibi defense challenges the State's ability to prove the statutory elements." *Fulton*, 742 P.2d at 1213. This position is consistent with Utah case law, *see id.; Romero*, 554 P.2d at 219, as well as case law from other jurisdictions, *see Ragland v. State*, 238 Ala. 587, 192 So. 498, 501 (1939) (" 'The defense of an alibi not only goes to the essence of guilt, but it traverses one of the material averments of the indictment, namely, that the defendant did then and there the particular act charged. It is not an affirmative, nor an extrinsic defense. The presence of the accused at the time and place must be shown as essential to the commission of the crime.' ") (quoting I *Wharton's Criminal Evidence* § 333 (10th ed.)); *Doisher v. State*, 632 P.2d 242, 259 (Alaska Ct.App.1981) ("In this case, [the defendant] did raise an alibi defense, but alibi is not an affirmative de-

fense."); *People v. Nunez*, 841 P.2d 261, 263–64 (Colo.1992) (en banc) (reiterating the language of a previous case holding that alibi is not an affirmative defense); *Brown v. State*, 958 A.2d 833, 838 (Del.2008) ("[B]ecause the defense of alibi is not an affirmative defense, the defendant does not have the burden of proving his alibi."); *Hill v. State*, 290 Ga. App. 140, 658 S.E.2d 863, 867 (2008) ("[A]libi is not an affirmative defense . . . since the true effect of an alibi defense is to traverse the [S]tate's proof that the defendant committed the crime[.]" (second alteration in original) (internal quotation marks omitted)).

¶ 17 Because we conclude that alibi is not an affirmative defense, we also conclude that Defendant's trial counsel did not err in failing to request an additional jury instruction regarding burdens of proof associated with such a defense. Accordingly, Defendant cannot meet the first prong of the ineffective assistance of counsel test, *see Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162 (stating that in order to prove ineffective assistance of counsel, a party must first demonstrate that counsel's performance was objectively deficient), which is fatal to his ineffective assistance of counsel claim, *see generally State v. Lopez*, 886 P.2d 1105, 1115 (Utah 1994) ("Because [the defendant] has not satisfied the first prong of the [ineffective assistance of counsel] test, we do not need to determine whether he has satisfied the second prong."). Furthermore, Defendant's claims of plain error and manifest injustice similarly fail. *See State v. Saunders*, 1999 UT 59, ¶ 62 n. 4, 992 P.2d 951 (stating that plain error requires that an error actually occur). *See generally Alinas*, 2007 UT 83, ¶ 10, 171 P.3d 1046 (stating that manifest injustice is synonymous with plain error).

## II. The Prosecutor Did Not Engage in Misconduct During Closing Argument

¶ 18 Defendant next contends that the prosecutor engaged in misconduct by referring in her closing argument to the exchange that occurred between Carter and Defendant at the hospital and then arguing that it suggested Defendant's guilt. Again, Defendant concedes that trial counsel did not object to the prosecutor's statement, but Defendant

nonetheless claims that this court should review the alleged error for plain error or ineffective assistance of counsel.

 ¶ 19 Defendant argues that trial counsel rendered ineffective assistance when he failed to object to the following statement the prosecutor made to the jury during closing argument:

> And the other thing [Defendant] said was to a person he considered his best friend that goes to the hospital, that's there with him in his time of grief, and he walks up and the first thing he says [is, "]what have I—what am I going to do without her?["] What have I done?[ ] He killed his wife. He did it intentionally and then he tried to cover his tracks by hiding his truck in the garage. And we ask you to find him guilty on both counts.

We disagree with Defendant's contentions. As previously discussed in more detail in footnote 2, it is clear that there is a punctuation error in the transcript. Indeed, based on the approximately five second pause between the sentences, when the prosecutor asked, "What have I done?" she was no longer quoting Defendant. Rather, she was merely asking the jury to draw an inference from the evidence, that is, that when Defendant said to Carter "What have I—" and then stopped before he was finished, he actually stopped himself from saying "What have I done?" We conclude that this was a completely reasonable inference based on what Carter testified Defendant said to him at the hospital. Accordingly, the prosecutor did not engage in misconduct by making the statement to the jury.

■ ¶ 20 To prevail on an ineffective assistance of counsel claim on appeal, Defendant must demonstrate both that his trial counsel rendered objectively deficient performance and that the deficient performance prejudiced him. *See State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162. We have determined that the prosecutor did not engage in misconduct during her closing argument to the jury. Accordingly, trial counsel did not err in failing to object to the prosecutor's closing argument. Because no error occurred, Defendant's ineffective assistance of counsel claim

fails, *see id.*, as do his claims of plain error and manifest injustice.

## CONCLUSION

¶ 21 We conclude that alibi is not an affirmative defense. Additionally, we determine that the prosecutor did not engage in misconduct during her closing argument to the jury. Accordingly, Defendant's trial counsel did not render ineffective assistance for failing to request an additional instruction on the burdens of proof associated with an affirmative defense or in failing to object to the prosecutor's statements during closing argument. Defendant's claims of plain error and manifest injustice similarly fail. Affirmed.

¶ 22 WE CONCUR: WILLIAM A. THORNE JR. and STEPHEN L. ROTH, Judges.