2017 UT App 86

## THE UTAH COURT OF APPEALS

SHERMAN A. LYNCH,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20140402-CA
Filed May 25, 2017

Third District Court, Salt Lake Department
The Honorable Deno G. Himonas
No. 110913691

Scott S. Bell, Michael W. Young, and Alan S.
Mouritsen, Attorneys for Appellant

Sean D. Reyes, Ryan D. Tenney, and Daniel W.
Boyer, Attorneys for Appellee

JUDGE MICHELE M. CHRISTIANSEN authored this Opinion, in
which JUDGES GREGORY K. ORME and J. FREDERIC VOROS JR.
concurred.

CHRISTIANSEN, Judge:

¶1     Sherman A. Lynch appeals the postconviction court's
dismissal of his petition filed pursuant to the Utah Post-
Conviction Remedies Act (the PCRA). We affirm.

BACKGROUND

¶2     On the afternoon of October 3, 2007, Patricia Rothermich
(Victim) was out walking when a vehicle struck her from behind,

splitting her calf open and catapulting her over forty feet.[1] The driver of the vehicle did not stop and there were no other witnesses. Victim died on the way to the hospital.

¶3     Victim was Lynch's wife. In the days following Victim's death, Lynch appeared on television, asking for the public's help in finding the driver of a white truck or van police believed to have been involved in the collision. Lynch's then-girlfriend saw these broadcasts and, apparently distressed by the discovery that he was married, informed police that she had helped Lynch buy a white truck at an auction and that he kept it in a garage near his house.

¶4     Police searched the garage and found scraps of carpet with white spray paint on them, as well as metal shavings. The truck was not there, but the owner of the garage stated that Lynch had kept a white truck in the garage before Victim's death, that Lynch had painted over rust spots on the truck with spray paint, and that, at least on one occasion, the truck's hood had blown open while Lynch was driving it.

¶5     A white truck was later discovered in a different garage at an abandoned property. That truck's Vehicle Identification Number matched the one on the truck Lynch had bought at auction. One of the investigating detectives, Detective Anderson, examined the truck and saw "exactly the kind of damage" he "expect[ed] to see" from a collision like the one that killed Victim. He also noted that the truck's hood did not close properly and that holes had been drilled into the truck's front frame. Detective Anderson saw a tow hook and a bug guard

---

1. A recitation of the facts surrounding Lynch's criminal case is necessary to understand the issues on appeal. We present the facts "in a light favorable to the prosecution, and consistent with the judgment of conviction." *Pinder v. State*, 2015 UT 56, ¶ 5 n.1, 367 P.3d 968.

spoiler on the front of the truck, either of which he thought might have caused Victim's calf injury. DNA from an unidentifiable female was found on the truck's spoiler. Inside the engine block, officers found a zip-tie fragment with "random fracture lines" that "match[ed] up perfectly" with the fracture lines on one of several zip ties found at the scene of the collision.

¶6     Officers also contacted the previous owner of the truck, who confirmed that the hood of the truck did not latch properly but stated that he had not used zip ties to hold the hood down. The previous owner examined the truck and noted several changes since it had been sold: the rust spots had been covered by white paint, an antenna was missing, the windshield was cracked, the hood had sustained new damage, and there were "two holes in the sheet metal under the hood along the front of the engine compartment."

¶7     The police then interviewed Lynch, who initially denied owning any vehicles besides his van, purchasing any vehicles recently, or keeping vehicles in the garage near his house. However, when the interviewing officer asked Lynch about a truck, Lynch admitted that he had bought a truck for his teenaged son. When asked where that truck was, Lynch claimed that it had broken down on the freeway several weeks earlier and that he had given the truck to a passerby named "Chuck" who stopped to help.[2]

---

2. An officer testified that he had calculated the mileage from the auction house to Lynch's house to the place on the freeway where Lynch said he had given the truck to Chuck to the abandoned property where the truck was found. According to the officer, the calculated mileage exceeded the number of miles actually added to the truck's odometer since Lynch had purchased it at auction.

¶8 Officers searched Lynch's home and discovered five white spray paint cans. They also found the truck's title and registration behind the license plate of Lynch's van. And a forensic analyst (the Paint Analyst) testified that the paint fragments found on Victim's clothing could have come from the same source as the original paint on the truck because the fragments were of the "same distinct type of paint as that on the hood of the truck" and matched it on multiple microscopic layers. The Paint Analyst also testified that paint smears found elsewhere on Victim's clothing were from the "same distinct type" of spray paint as had been more recently used on the truck.

¶9 Lynch was ultimately convicted of murder and obstruction of justice in connection with the death of Victim. Following Lynch's convictions, trial counsel withdrew from the case, and Lynch moved for a new trial on two main grounds: (1) ineffective assistance of trial counsel and (2) newly discovered evidence. Specifically, Lynch asserted that trial counsel were ineffective because they "did not share discovery with him, did not adequately consult with [him] prior to or during the trial, did not pursue investigative leads, and did not properly advise [him] prior to or during the trial." Lynch further asserted that he had located a witness—an individual named Ashe—"with evidence that strongly suggests that neither [he] nor his truck was involved in the hit and run which claimed the life of [Victim]" and that this newly discovered evidence warranted a new trial.

¶10 In support of his motion, Lynch submitted "a scale diagram showing the locations of the injuries, the paint analysis done on [Victim's] pants, and the various damage oxidation marks on his truck," which, according to Lynch, "his trial attorneys refused to submit and/or argue to the jury." Lynch also submitted a handwritten letter, in which he made arguments regarding the height of the truck's tow hook and other

components of the truck as compared to Victim's injuries. He also asserted that, before trial, he had "pointed out" relevant evidence to trial counsel that they improperly "thought was not [germane] to [his] defense," including pretrial testimony from Detective Anderson regarding certain oxidation and paint transfers (or the lack thereof) onto Victim's clothing that made it "impossible" for Lynch's truck to have been the vehicle that struck Victim. After an evidentiary hearing, the trial court denied Lynch's motion for a new trial.

¶11    Represented by new counsel, Lynch then filed a direct appeal. *See State v. Lynch*, 2011 UT App 1, 246 P.3d 525. Lynch claimed "that the trial court erred in failing to give a jury instruction regarding his alibi defense and that the prosecutor engaged in misconduct by making statements during closing argument implying that [Lynch] had confessed to the crime." *Id.* ¶ 13. This court affirmed Lynch's convictions. *Id.* ¶¶ 1, 21.

¶12    Lynch then filed a PCRA petition,[3] raising twenty-nine issues, which largely fell into two categories—ineffective assistance of counsel and newly discovered evidence. More specifically, regarding Lynch's ineffective-assistance claims, he raised (1) three claims relating to two potential witnesses—Ashe and another individual named Maxwell; (2) five claims relating to the truck's physical components and damage to the truck; (3) four claims relating to the truck's grille;[4] (4) five claims

---

3. Lynch filed his initial PCRA petition pro se. Thereafter, Stephen B. Austin filed a notice of appearance as counsel for Lynch; Austin then filed an amended PCRA petition.

4. The record on appeal contains references both to the truck's "grill" and the truck's "grille." To avoid confusion, we use the term "grille" throughout this decision.

relating to Victim's injuries; (5) five claims relating to the zip ties; and (6) six claims relating to paint and paint analysis.

¶13    In support of his newly discovered evidence claim, Lynch submitted affidavits from two private investigators—Terry Steed and Benjamin Warren—who had examined Lynch's truck in February 2012. In his affidavit, Warren stated that Detective Anderson had told him and Steed that "there were no zip ties found at the actual scene" and that "the zip ties were used by the police officers, themselves, while transporting the Truck from its initial location to the Evidence Center." In his affidavit, Steed corroborated Warren's statements regarding the zip ties. Steed further attested that the truck's front grille was intact and that there "was no physical evidence suggesting that the front grille had sustained any damage, or that it had been broken in any way." He also attested that the truck's hood latch "appeared to work perfectly for the age of the vehicle" and that "there was no evidence of a malfunction." Finally, Steed attested that "no 'tow hook or tow ring' could be located on the Truck's front end."

¶14    The State moved for summary judgment on all of Lynch's claims, arguing that many of Lynch's ineffective-assistance claims were procedurally barred because he had previously raised them during the new-trial proceedings. Alternatively, the State argued that all of Lynch's ineffective-assistance claims failed as a matter of law. The State further argued that Lynch's newly discovered evidence claim failed as a matter of law.

¶15    The postconviction court rejected some of Lynch's claims as procedurally barred; it determined that "[t]he essence of the grounds underlying" Lynch's "first, second, third, fourth, eleventh, sixteenth, eighteenth, nineteenth, twentieth, twenty-first, twenty-second, and twenty-third claims for relief" had "previously been raised in either Lynch's motion for a new trial or on appeal" and were therefore procedurally barred under the PCRA. The court rejected some of Lynch's claims on the merits; it determined that "[w]ith respect to [Lynch's] third, fourth, fifth,

sixth, seventh, eighth, ninth, tenth, twelfth, thirteenth, fourteenth, fifteenth, twenty-first, twenty-fourth, twenty-fifth, twenty-sixth, twenty-seventh, and twenty-eighth claims, the State has shown that Lynch's previous counsel had a conceivable tactical basis or justification for failing to take the action in question." The court further determined that Lynch could not demonstrate prejudice with respect to any of the claims.

¶16　The court denied the State's motion for summary judgment on Lynch's newly discovered evidence claim and held an evidentiary hearing. Among others, Warren, Steed, and Detective Anderson testified at the hearing. At the conclusion of the hearing, the postconviction court denied Lynch's petition "in its entirety." The court concluded that Lynch was "miles and miles away" from meeting the PCRA's newly discovered evidence standard.

¶17　Lynch appeals.

ISSUES

¶18　First, Lynch contends that the postconviction court erroneously granted the State's motion for summary judgment on his claims of ineffective assistance of counsel. Second, Lynch contends that the postconviction court erroneously concluded that his newly discovered evidence "was insufficient to demonstrate that no reasonable trier of fact could have found [him] guilty of the charged offense."

ANALYSIS

I. Ineffective Assistance of Counsel

¶19　Lynch first contends that "[t]he [postconviction] court erred by granting the State's motion for summary judgment on

[his] claims of ineffective assistance of counsel." "We . . . review the postconviction court's grant of summary judgment for correctness." *Honie v. State*, 2014 UT 19, ¶ 28, 342 P.3d 182. "We affirm a grant of summary judgment when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Ross v. State*, 2012 UT 93, ¶ 18, 293 P.3d 345 (citation and internal quotation marks omitted). "In making this assessment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Id.* (citation and internal quotation marks omitted).

¶20 "The PCRA affords a convicted defendant the opportunity to have his conviction and sentence vacated or modified under certain circumstances." *Kell v. State*, 2008 UT 62, ¶ 13, 194 P.3d 913 (citation and internal quotation marks omitted). "A petition for post-conviction relief is not a substitute for appellate review, but only a collateral attack on a conviction or sentence." *Id.* (citation and internal quotation marks omitted). Under the PCRA, a claim is barred if it "was raised or addressed at trial or on appeal." Utah Code Ann. § 78B-9-106(1)(b) (LexisNexis 2012).[5] Likewise, a claim is barred under the PCRA if it "could have been but was not raised at trial or on appeal" unless "the failure to raise that ground was due to ineffective assistance of counsel." *Id.* § 78B-9-106(1)(c), (3).

---

5. Lynch filed his amended petition in February 2013. The Utah Legislature amended certain provisions of the PCRA in 2017. For clarity, we cite to the 2012 version of the Utah Code, which was the version in effect when Lynch filed his amended petition. *See generally Peterson v. Kennard*, 2008 UT 90, ¶ 12 n.6, 201 P.3d 956 (noting that the PCRA had been amended and renumbered in 2008, and citing the version in effect at the time of the petition for postconviction relief).

¶21 We begin our analysis by considering whether any of Lynch's ineffective-assistance claims are procedurally barred.

A. Barred Ineffective-Assistance Claims

¶22 The PCRA precludes relief on any ground that "was raised or addressed at trial or on appeal." Utah Code Ann. § 78B-9-106(1)(b).

¶23 Lynch asserts that trial counsel were constitutionally ineffective for (1) failing to examine his truck, (2) failing "to test the State's theory regarding the zip ties," (3) failing "to investigate the paint found on Victim's clothing or to consult or call an expert for the defense," and (4) failing to interview or follow up with two potential witnesses. He further asserts that appellate counsel was ineffective for failing to argue trial counsel's ineffectiveness regarding these claims.

¶24 The State asserts that Lynch's truck examination claims, paint claims, and claims concerning Maxwell and Ashe "were 'raised or addressed' in the new trial motion" and are consequently barred pursuant to subsection 78B-9-106(1)(b).[6] Lynch responds that his ineffective-assistance claims "should not be barred . . . because [he] did not 'raise' his post-conviction claims in his motion for new trial."[7] According to Lynch, he

---

6. The State concedes that it "has not argued that [the zip-tie] claims were raised or addressed in the new trial proceedings, and the State therefore does not contend that those are prohibited by [subsection 78B-9-106(1)(b)'s] previous-litigation procedural bar." Accordingly, we will address those claims on their merits. *Infra* ¶¶ 53–61.

7. In his opening brief, Lynch also asserted that subsection 78B-9-106(1)(b)'s procedural bar "extends only to claims raised 'at trial' or 'on appeal,' and therefore does not extend to claims raised in

(continued…)

"hinted at some of his . . . claims during the hearing on his motion for new trial and in handwritten letters to the trial court, but nothing said during that hearing or in those letters suggests that [he] 'raised' the claims for purposes of applying [subsection] 78B-9-106(1)(b)'s bar." We address Lynch's claims in turn to determine whether they are procedurally barred pursuant to subsection 78B-9-106(1)(b) of the PCRA.

### 1. Truck claims

¶25 First, Lynch contends that trial counsel performed deficiently by failing to examine his truck "even though the State's case was devoted almost exclusively to convincing the jury that the white truck was the murder weapon." Lynch observes that "the State introduced evidence to suggest that a 'tow hook' on the front of the white truck explained the devastating injury to [Victim's] left calf" and to "suggest that a broken zip tie was found in the white truck's engine compartment, and that the zip tie was likely used to secure the truck's purportedly faulty hood." According to Lynch, trial counsel "never examined the truck, never personally saw it, never tested it, and never double-checked the accuracy of the State's examination." The State contends that Lynch "thoroughly

---

(…continued)

a motion for new trial." However, in his reply brief and during oral argument before this court, Lynch conceded that the Utah Supreme Court has since rejected this argument. In *Pinder v. State*, 2015 UT 56, 367 P.3d 968, our supreme court observed that although "we sometimes speak of a 'trial' as a reference to the proceedings that begin with opening statements and end with a verdict," "[w]e may also speak of the 'trial' proceedings as encompassing everything that happens *in the trial court*. And that is the sense of 'at trial' in the PCRA." *Id.* ¶ 41 (emphasis in original).

covered this in his new trial motion in the criminal case" where "he argued that his trial counsel were ineffective for 'fail[ing] to have important evidence examined and/or challenged.'"

¶26 In his motion for a new trial, Lynch argued that trial counsel "failed to have important evidence examined and/or challenged." More specifically, Lynch asserted that "his truck was in such poor operating condition that it could not have even made it to the place where his wife was killed." According to Lynch, he "repeatedly asked his attorneys to have the truck examined by a mechanic to determine its working condition," and he "informed counsel that brake and engine problems made it virtually impossible to go up or down hills of anything other than the mildest grade." Nevertheless, Lynch argued, "trial counsel failed to have the truck checked and the unopposed evidence at trial was that the truck ran fine." Lynch also noted that he was "still in the process of having the truck checked mechanically" by a "certified GM master mechanic."

¶27 Before the hearing on Lynch's motion for a new trial, one of Lynch's trial attorneys—Julie George—submitted an affidavit. In her affidavit, George attested that

> 17. Mr. Lynch indicated to me and to [the] private investigator that the subject vehicle would not start, run, or brake.
>
> 18. I contacted [the prosecutor] to make arrangements for a test-drive of the truck. When those arrangements were made, shortly before trial, I informed Mr. Lynch of this.
>
> 19. I met with Mr. Lynch and told him of the arrangements and that the detective would need to be present during the test-drive. I informed him that, should the vehicle be operational, he would be left with those facts for trial. In the presence of

the private investigator, Mr. Lynch told me that he did not want the vehicle tested.

George testified similarly at the hearing on Lynch's motion. In ruling on Lynch's motion for a new trial, the trial court credited George's affidavit and testimony, and concluded:

> As to the operational capabilities of the truck, George met with Lynch and informed him "that the detective would need to be present during the test-drive" and "that should the vehicle be operational, he would be left with those facts for trial." Lynch then instructed George "that he did not want the vehicle tested." Moreover, since the trial, Lynch has arranged to have "the truck checked mechanically." In his Motion, he noted that should this inspection yield additional information, he would submit it to the court. Tellingly, no additional information has been forthcoming.

(Citations omitted.)

¶28 Thereafter, in his PCRA petition, Lynch generally alleged that trial counsel were ineffective for "fail[ing] to investigate and to examine the alleged murder weapon," i.e., his white truck. As part of this claim, he specifically alleged that "[t]he grille, had it struck [Victim], would have been damaged, but it was not"; that "[t]he prosecution witnesses . . . testified that there was a tow hook on the vehicle which caused injury to [Victim's] legs, when in fact there was no such tow hook on [Lynch's] vehicle"; that "[t]he grille configuration on [Lynch's] vehicle was inconsistent with the diagrams of the grille presented to the jury by the prosecution"; that "[t]here was no proof as to the presence or lack thereof of any holes or parts of the truck into which zip ties would have been placed in order to keep the hood down"; and that "[n]either a mechanic [n]or body repair expert were

consulted." The postconviction court determined that Lynch's failure-to-investigate claim was procedurally barred.

¶29    To the extent that Lynch's failure-to-investigate claim was based on the mechanical or operational capabilities of his truck, we conclude that the postconviction court correctly determined that the claim was procedurally barred, as it had been raised and addressed in the new-trial proceedings. *See* Utah Code Ann. § 78B-9-106(1)(b) (LexisNexis 2012). We reach the merits of Lynch's remaining claims regarding counsel's failure to examine the physical components of Lynch's truck, i.e., the tow hook, hood, and grille, and conclude that no prejudice resulted from appellate counsel's omission of those claims on direct appeal.[8] *See infra* ¶¶ 47–52.

2.    Paint claims

¶30    Second, Lynch contends that trial counsel were ineffective for failing "to investigate the paint found on Victim's clothing or to consult or call an expert witness for the defense." Lynch also argues that trial counsel were ineffective for "fail[ing] to press the [State's] expert with respect to the absence of oxidized material on [Victim's clothing]." The State responds that the trial court "specifically rejected these claims in [its] new trial ruling."

---

8. As previously mentioned, Lynch raised twenty-eight specific ineffective-assistance claims in his PCRA petition. *Supra* ¶ 12. On appeal from the postconviction court's ruling, however, Lynch has consolidated those twenty-eight specific claims into four generalized claims. Consequently, it is difficult for this court to determine which of the postconviction court's rulings on Lynch's PCRA petition claims (as originally numbered) he takes issue with on appeal, which claims were procedurally barred, and which claims should be addressed on their merits.

¶31 In his motion for a new trial, Lynch argued that trial counsel were ineffective because they "barred [him] from presenting certain evidence and arguments at his trial." Lynch asserted that he "had prepared a scale diagram showing the locations of the injuries, the paint analysis done on [Victim's] pants, and the various damage and oxidation marks on his truck which his trial attorneys refused to submit and/or argue to the jury." Lynch further asserted that the diagram "shows that the injuries and the paint from the pants could not have been caused by his truck as they simply did not match up with one another. Such information and analysis could have been vital had it been shown and/or argued to the jury."

¶32 Additionally, in his handwritten post-trial letter, Lynch asserted that before trial, he had "pointed out" relevant evidence to trial counsel that they improperly "thought was not [germane] to [his] defense." Specifically, Lynch observed that Detective Anderson had testified "at Pre-Trial" that there was "some white oxidation on the grille" of Lynch's truck "that was easily 'transferred onto [Detective Anderson's] finger,'" but that "[t]he Paint Analyst could not match this oxidation to anything found on [Victim's] clothes, which would have been impossible if she had been hit by the grille of [Lynch's truck]." He also noted that Detective Anderson "had described a black paint that covered the grille [that] was flaking off" and that "the Paint Analyst did not find any of this black, flaking paint on [Victim's] clothes, which would have been impossible if she had been hit by [Lynch's] truck." Finally, Lynch noted that "samples of white oxidize[d] (Rustoleum) paint taken from the doors and truck bed of [the] truck were described as a possible source for the Rustoleum paint smeared on [Victim's] clothes" but that based on Detective Anderson's testimony, there was "no opportunity for [Victim] to have had any contact with the sides, doors, or rear of that vehicle." Thus, Lynch asserted, it "would be impossible" for his truck to have hit Victim because "[t]here was no Rustoleum on the front of the truck found to be transferred to

[Victim's] clothes." Lynch testified similarly at the hearing on his motion for a new trial.

¶33    At the hearing on the motion for a new trial, George testified that she did not "feel any need to get a separate expert with regard to the paint." George testified that she, Lynch,

> and the [private] investigator began discussing the paint issue [around] September, . . . and discussing the analysis of the paint, the two different types of paint, the kind that was on the truck already, factory paint, and then the over-spray paint and discussed those issues. We felt, myself and the investigator, that any information we would present at trial, it was information that we would get from the State's expert anyway. So we felt through cross-examination we could adequately put forth any questions that we had.

George further testified that she felt she had adequately "put forth that information" at trial.

¶34    In ruling on Lynch's motion for a new trial, the trial court noted that "Lynch claims to have correlated information regarding . . . the paint transfers (or non-transfers), that made it impossible for his truck to have struck [Victim] and that this information was not presented at trial." The court stated that "*all* of the information to which Lynch refers came out at trial. What Lynch is really taking issue with is the relative emphasis his trial attorneys placed on the different bits of information." The court then observed that in preparing for trial, trial counsel "engaged the services of a private investigator who had a background in accident reconstruction and, together with the investigator, spent a significant amount of time going through the discovery concerning the 'accident' reconstruction" and that "[b]ased upon this review, trial counsel concluded that all of the necessary information could be brought out through the State's own

witnesses." The court further observed that "the information about the gathering and comparison of the paint samples came out in the testimony of [the Paint Analyst]" and that during closing argument, "with respect to the paint transfer, [trial counsel] reminded the jury that the paint analyst had concluded that a 'clear smudge' found on [Victim's] clothing did not match up with anything 'found on the truck.'" Ultimately, the court concluded that "the jury heard all of the evidence to which Lynch refers and trial counsel's take on that evidence."

¶35 Consequently, the postconviction court ruled that the following ineffective-assistance claims from Lynch's PCRA petition were procedurally barred: (1) trial counsel's failure to "cross-examine Detective Anderson and [the Paint Analyst] on the lack of any transfer of weathered oxidized plastic from [Lynch's] truck's grille to [Victim's] clothes, had this particular grille impacted her in the auto-pedestrian collision"; (2) trial counsel's failure to "challenge the lack of expertise of [Detective] Anderson, and fail[ure] to raise the inconsistency between [the Paint Analyst's] testimony concerning white paint smears on [Victim's] pants, and Detective Anderson's testimony on the same issue"; (3) trial counsel's failure to "cross-examine Detective Anderson about the inconsistency between the location of the white paint smears on [Victim's] pants versus the location of any of the laceration or abrasion injuries observed at her autopsy"; (4) trial counsel's failure to "properly cross-examine [the Paint Analyst] concerning her Paint Analysis Report, and [failure] to retain an expert on the issue of paint analysis"; and (5) trial counsel's failure to "cross-examine [the Paint Analyst] about the flaking and chipped black metallic paint on the grille from [Lynch's] truck that would have been transferred to [Victim's] clothing on impact." We agree.

¶36 Lynch raised his claims regarding the paint on Victim's clothing, the lack of an expert witness for the defense, and the absence of oxidized material and black paint on Victim's

clothing in his motion for a new trial. *Supra* ¶¶ 31–32. The trial court acknowledged Lynch's argument that "the paint transfers (or non-transfers) . . . made it impossible for his truck to have struck [Victim] and that this information was not presented at trial." And the trial court concluded that "*all* of the information to which Lynch refers came out at trial," that Lynch was "really taking issue with . . . the relative emphasis his trial attorneys placed on the different bits of information," and that "the jury heard all of the evidence to which Lynch refers and trial counsel's take on that evidence." (Emphasis in original.) Lynch has not demonstrated error in this conclusion. Consequently, we affirm the postconviction court's ruling that Lynch's ineffective-assistance claims regarding the paint and paint analysis were procedurally barred. *See* Utah Code Ann. § 78B-9-106(1)(b) (LexisNexis 2012).

3.     Potential witnesses

¶37     Lynch next argues that trial counsel were ineffective for failing to follow up with two potential witnesses—Maxwell and Ashe—and that trial counsel's "failure to contact or follow up with Maxwell or Ashe fell below professional standards of assistance." The State argues that "Lynch specifically raised the claim about . . . Ashe in his new trial motion" and that although Lynch "did not identify Maxwell by name" at the new trial hearing, Lynch "raised the general issue during that proceeding." (Internal quotation marks omitted.)

¶38     In his newly discovered evidence claim in his motion for a new trial, Lynch asserted that a Detective Adamson had "received a message on an anonymous tip line from a caller identifying herself as '[Ashe]' and leaving a call back number." According to Lynch, Ashe claimed that

> she had overheard a conversation in a store
> between two men talking. One of the men,
> described as a male between 30 and 40 years of age

with olive skin and dark brown hair with blonde highlights, talked about having hit a woman in Holladay when he became distracted by something falling on the floor of his vehicle.

"[Ashe]" also overheard the men talking about how they had seen on the news that the woman had died. She was so concerned by their conversation that she then followed the men outside to the parking lot. She then saw the two men get into a white pickup truck with substantial damage to the front end and hood. "[Ashe]" was only able to get a partial Ski Utah license plate number of 758 XXX. Detective Adamson noted that no follow up to this tip would be done. Neither of the men matches a description of Mr. Lynch. Further, this partial plate number does not match the plate number of Mr. Lynch's truck.

¶39    At the hearing on Lynch's motion, George explained that she was aware of Ashe and that

[t]he concern we had [was] that information is hearsay, that someone had injured someone, meaning some other suspect would have hit an individual and fled the scene. My first concern was hearsay.

The second concern was if someone had really hit someone and fled the scene, and we were able to locate them, they would take the Fifth [A]mendment and would not have been allowed to testify anyway.

George further testified that the information regarding Ashe was "brought out during trial" and that

[i]t was similar to a number of situations where I felt based on trial strategy that it was better to address that issue through cross-examination of Detective Adamson and show the jury that there were other people that could have been looked at, other possibilities for explaining the motor vehicle accident, and then summarize that in closing argument.

¶40 In ruling on Lynch's motion for a new trial, the trial court observed that at the hearing, "Lynch's counsel conceded that [Lynch's newly discovered evidence] argument was subsumed by the 'ineffective assistance of counsel' argument." The court further observed that Lynch's complaint was that "trial counsel did not follow up with . . . Ashe." The court then determined that

trial counsel specifically elicited from Detective [Adamson], the individual in charge of the investigation, the information Ashe had overheard and passed on to the police. Then, in closing, trial counsel argued that the police disregarded this and other important pieces of information because they had already closed their minds to the possibility that someone other than Lynch killed [Victim].

Consequently, the court concluded that trial counsel "did not fail to follow obvious investigative leads or to have important evidence examined or challenged."

¶41 In his PCRA petition, Lynch claimed that "[trial] counsel did not retain an investigator to further investigate this matter, nor did [trial] counsel subpoena . . . Ashe to trial" and that "[t]here was no strategic reason for such failures on the part of [trial] counsel." The postconviction court determined that this claim was procedurally barred pursuant to subsection 78B-9-106(1)(b). We agree. Lynch specifically raised his ineffective-

assistance claim regarding Ashe in his motion for a new trial, and the trial court ruled on and rejected that claim. Consequently, we conclude that the postconviction court correctly ruled that Lynch's ineffective-assistance claim regarding Ashe was procedurally barred. *See* Utah Code Ann. § 78B-9-106(1)(b) (LexisNexis 2012).

¶42    Lynch's other potential witness, an individual named Maxwell, submitted a sworn witness statement asserting that he was in the area on the afternoon Victim was killed and that he "heard a loud noise—like a[] . . . truck that had hit a speed bump or a pothole. I looked toward the road [and] saw what I think was a large red truck driving by." The State acknowledges that although Lynch stated at the hearing on his motion for a new trial that he "had located five, possibly six people who had called into the police with other leads of people who could have been there," Lynch did not mention Maxwell by name. In his PCRA petition, Lynch asserted that trial counsel were ineffective for failing to subpoena Maxwell as a witness for the defense and for failing to "cross-examine Detective Adamson concerning his testimony that there was 'no reason to go looking for a red truck.'" The postconviction court determined that these claims were procedurally barred and that they failed on the merits.[9] Because the postconviction court reached the merits of Lynch's claims regarding Maxwell, we follow suit and examine the merits of the issue. *Infra* ¶¶ 62–68.

---

9. The postconviction court addressed Lynch's claims concerning Maxwell under both subsections 78B-9-106(1)(b) and (1)(c) of the PCRA. *See* Utah Code Ann. § 78B-9-106(1)(b), (c) (LexisNexis 2012). The court acknowledged that while "the essence" of Lynch's Maxwell claims "was largely raised in previous proceedings," the claims "may not have been expressly raised previously."

B.      Remaining Ineffective-Assistance Claims

¶43   Turning to Lynch's remaining ineffective-assistance claims, in his briefing, Lynch's claims are generally set forth as ineffective-assistance-of-trial-counsel claims. But at the end of his briefing, Lynch also contends that "[g]iven the disputes of material fact as to whether trial counsel performed deficiently, there is a genuine dispute of material fact as to whether appellate counsel's performance fell short of the Sixth Amendment's requirements." We thus understand Lynch also to be arguing that his appellate counsel performed ineffectively in failing to assert the ineffectiveness of his trial counsel.

¶44   First, we conclude that Lynch's claims of ineffective assistance of trial counsel could have been but were not raised on direct appeal and are therefore barred. *See* Utah Code Ann. § 78B-9-106(1)(c) (LexisNexis 2012). Lynch was represented by new counsel on direct appeal who could have raised these claims that trial counsel were constitutionally ineffective. *See Hamblin v. State*, 2015 UT App 144, ¶ 10, 352 P.3d 144. Lynch has not demonstrated, or argued, that these claims could not have been brought on appeal or that they "were unavailable to appellate counsel at the time of his appeal." *See id.* Consequently, the PCRA bars Lynch's postconviction claims directly challenging his trial counsel's performance.

¶45   Nevertheless, Lynch may obtain relief under the PCRA if he "demonstrates that appellate counsel's failure to argue trial counsel's ineffectiveness was itself ineffective assistance of counsel." *See id.* ¶ 11; Utah Code Ann. § 78B-9-106(1)(c), (3). Because Lynch's "'claim that his appellate counsel was ineffective is intertwined with and dependent upon his claim[s] that his trial counsel [were] ineffective,' we must 'examine the merits of the claim[s] of ineffective assistance of trial counsel' to determine if appellate counsel rendered ineffective assistance." *See Hamblin*, 2015 UT App 144, ¶ 11 (quoting *Ross v. State*, 2012 UT 93, ¶ 25, 293 P.3d 345); *see also Ross*, 2012 UT 93, ¶ 52 ("In

other words, the appellate counsel claim is the gateway to the otherwise procedurally barred trial counsel claim."). We may examine the merits of those claims "only to the extent required to address the ineffective assistance of appellate counsel claim." *Ross*, 2012 UT 93, ¶ 25 (citation and internal quotation marks omitted).

¶46    "The standard for evaluating whether appellate counsel is ineffective is the same *Strickland* standard used to determine whether trial counsel is ineffective." *Kell v. State*, 2008 UT 62, ¶ 42, 194 P.3d 913. To succeed on a claim of ineffective assistance of counsel, a defendant must prove that counsel's "representation fell below an objective standard of reasonableness" and that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). "To show that appellate counsel was ineffective in failing to raise a claim, the petitioner must show that the issue [was] obvious from the trial record and . . . probably would have resulted in reversal on appeal."[10] *Kell*, 2008 UT 62, ¶ 42 (alteration and omission in original) (citation and internal quotation marks omitted). "[W]hen making a claim under the PCRA, the petitioner bears the burden of establishing ineffective assistance of appellate counsel." *Ross*, 2012 UT 93, ¶ 24.

1.    Lynch's truck

¶47    Lynch first argues that appellate counsel should have raised a claim that trial counsel were ineffective for failing to examine his truck. Lynch asserts that "the State introduced evidence to suggest that a 'tow hook' on the front of the white truck explained the devastating injury to [Victim's] left calf" and to "suggest that a broken zip tie was found in the white truck's

---

10. Notably, in his briefing, Lynch does not mention the standard for evaluating whether appellate counsel was ineffective.

engine compartment, and that the zip tie was likely used to secure the truck's purportedly faulty hood." According to Lynch, trial counsel "never examined the truck, never personally saw it, never tested it, and never double-checked the accuracy of the State's examination." Turning to prejudice, Lynch asserts that if trial counsel had examined the truck, they would have learned that the truck did not have a tow hook on it, that the truck's hood was not faulty, and that the grille was undamaged and its "spacing . . . did not line up with the alleged grille marks found on the victim's body." Lynch contends that on direct appeal, "appellate counsel never pointed to counsel's investigative deficiencies."[11]

¶48    We first note that Lynch supports his truck examination claims with citations to Steed's affidavit. With regard to the tow hook, Steed stated in his affidavit: "On our hands and knees, . . . Warren and I physically checked on and under the Truck's front bumper, but no 'tow hook or tow ring' could be located on the Truck's front end." As to the truck's hood, Steed stated: "With respect to the hood latch of the Truck, Agent Warren and I examined the hood latch, and found it appeared to work perfectly for the age of the vehicle. . . . [T]here was no evidence of malfunction." And with regard to the truck's grille, Steed's affidavit stated that "[t]he front grille was intact. There was no physical evidence suggesting that the front grille had sustained any damage, or that it had been broken in any way." However, Steed and Warren did not examine Lynch's truck until 2012, approximately two years after Lynch's 2010 direct appeal and five years after the crime occurred. Lynch does not claim that, during the intervening years, the truck was kept unrepaired

---

11. Lynch does not assert that appellate counsel should have examined the truck, but only that appellate counsel was ineffective for failing to claim on direct appeal that trial counsel were ineffective for failing to examine the truck.

and in the same condition as it was initially found in 2007. Nor does he provide affidavits or other information supporting such a conclusion. Indeed, the State correctly observes that by the time Steed and Warren examined the truck in 2012, the truck had been partially disassembled, as evidenced by photographs contained in Lynch's own PCRA petition. Additionally, in his affidavit, Steed acknowledged that when he went to examine the truck, the truck's front grille had been removed from the truck and was "wrapped separately in brown paper." Consequently, Steed's and Warren's affidavits are not sufficient to establish the necessary prejudice for Lynch's ineffective-assistance claims relating to his truck's physical characteristics.

¶49    Moreover, based on the trial record that was available to appellate counsel, we conclude that it would not have been obvious to appellate counsel that a personal examination of the truck by trial counsel would likely have revealed exculpatory information. *See Kell*, 2008 UT 62, ¶ 42. We first address Lynch's argument regarding the tow hook. Lynch asserts that an examination of the truck by trial counsel would have revealed that "the truck does not have a tow hook on it." Even assuming, for the sake of argument, that there was never a tow hook on Lynch's truck, the State never alleged that the tow hook was the only possible source for Victim's leg injury. Indeed, while Detective Anderson testified at trial that "[i]t was believed that [the tow hook] potentially could have been involved with causing the injury to the [Victim's] calf or one of the calves," he also testified that there was a "splash guard" that was "very close . . . to some of the injuries that were identified on the [Victim's] calf." And, more importantly, in his handwritten letter supporting his motion for a new trial, filed before appellate counsel entered the picture, Lynch repeatedly referred to the tow hook and made arguments about its measurements, including "the distance the tow hook is from the truck[']s midline" and "the distance the tow hook is from the truck[']s bumper." Consequently, because Lynch essentially conceded the existence

of a tow hook on his truck, making an argument regarding the absence of the tow hook would not have been obvious to appellate counsel, *see Kell*, 2008 UT 62, ¶ 42, or even ethical.

¶50   Lynch also asserts that an examination of the truck by trial counsel would have revealed that "the truck's hood was not actually 'faulty.'" Even if appellate counsel had raised this ineffectiveness issue on appeal, we are not persuaded that doing so "probably would have resulted in reversal on appeal." *See Kell*, 2008 UT 62, ¶ 42 (citation and internal quotation marks omitted). The trial record contained multiple sworn statements indicating that the truck's hood did not latch properly. For example, at trial, Detective Anderson testified that the hood of the truck "did not appear to latch properly": "It didn't appear to—as you pushed it down to latch it in place, you'd expect it to stay. It doesn't appear to stay in place. It doesn't fully latch." The owner of the garage where Lynch kept his truck submitted an affidavit attesting that he once saw Lynch driving the truck and that the truck's hood blew open while the truck was in motion. Additionally, the truck's previous owner signed an affidavit attesting that "while he owned the pickup" "the hood latch was not working properly." Given the abundance of record evidence demonstrating that the truck's hood latch was indeed faulty, we conclude that Lynch has not shown that appellate counsel overlooked an obvious argument that probably would have resulted in reversal on appeal. *See Kell*, 2008 UT 62, ¶ 42.

¶51   Lastly, Lynch asserts that trial "counsel's investigation would have [revealed] exculpatory evidence in the form of an undamaged grille with different dimensions than the marks on [Victim's] body." Again, we conclude that this issue would not have been obvious from the trial record. Specifically, during closing argument, trial counsel highlighted that there was no evidence that the truck's grille was damaged:

> Do you remember how they ruled out Sherman Lynch's van? Because it didn't have any of the

damage consistent with this type of accident. Well, what kind of damage is that detective? Oh, you know, damage to the front end, to the grille, to the headlights, broken headlights, some damage to the hood. Okay, so let's look at the truck. Did you hear any testimony about [a] broken headlight? Nothing. Did you hear any testimony about damage to a grille? Nothing.

Moreover, during the hearing on Lynch's motion for a new trial, Lynch conceded that trial counsel had argued "about the no front-end damage" on his truck. Given that the trial record, including Lynch's own testimony, indicates that trial counsel had specifically alerted the jury to the fact that there was no evidence of damage to the truck's grille, an ineffective-assistance claim on this point would not have been obvious to appellate counsel, nor would raising it likely have resulted in reversal on appeal. *See Kell*, 2008 UT 62, ¶ 42. And with regard to Lynch's claim about the dimensions of the grille as compared to the marks on Victim's body, Lynch cites, without further explanation, to Steed's affidavit, an accompanying picture of the truck's grille, and to notes made by Detective Anderson during Victim's autopsy. There is, however, no apparent conflict between Detective Anderson's notes and the 2012 picture of the truck's grille, and Detective Anderson indicated in his notes that the relevant marks on Victim were only "*possible* marks from vehicular grille." (Emphasis added.) Consequently, an ineffective-assistance claim regarding the grille dimensions would not have been obvious to appellate counsel. *See id.*

¶52 We conclude, with regard to the truck examination claims, that Lynch has not demonstrated that appellate counsel missed an obvious issue from the trial record that probably would have resulted in reversal on appeal. *See id.* As a result, Lynch has not demonstrated that appellate counsel was ineffective for omitting these claims on direct appeal. *See id.*

Consequently, we conclude that the postconviction court correctly granted the State's motion for summary judgment on these claims. *See Honie v. State*, 2014 UT 19, ¶ 28, 342 P.3d 182.

2.     The zip ties

¶53     Next, Lynch argues that appellate counsel rendered ineffective assistance by failing to claim that trial counsel were ineffective for failing to "test the State's theory regarding the zip ties." Lynch argues that "[d]espite the central importance of the zip ties to the State's case, [trial] counsel never independently examined the zip ties, and declined to seriously probe the problems associated with them." More specifically, Lynch asserts that trial counsel failed to "have the zip ties tested for the presence of paint" or to "evaluate how the zip ties were placed on the truck or found at the crime scene." Again, Lynch asserts that on direct appeal, "appellate counsel never pointed to counsel's investigative deficiencies."

a.     Paint on the zip ties

¶54     First, Lynch argues that appellate counsel should have raised a claim that trial counsel were ineffective for failing to "have the zip ties tested for the presence of paint."

¶55     Even if we assume appellate counsel performed deficiently in failing to raise this claim, Lynch has not shown that he was prejudiced by appellate counsel's performance, because he has not shown that raising this claim "probably would have resulted in reversal on appeal." *See Kell v. State*, 2008 UT 62, ¶ 42, 194 P.3d 913 (citation and internal quotation marks omitted). Indeed, Lynch has not even asserted that reversal on appeal was likely if appellate counsel had raised this claim, let alone explained why. And as the State correctly points out, Lynch has "proffered nothing that showed that if the zip tie *had* been tested, the test would have shown that the white substance was not paint that matched the paint on his truck." (Emphasis in

original.) Consequently, Lynch has failed to carry his burden of establishing that appellate counsel was ineffective for failing to raise this claim. *See Ross v. State*, 2012 UT 93, ¶ 24, 293 P.3d 345 (explaining that a petitioner bears the burden of establishing ineffective assistance of appellate counsel).

b.     How the zip ties were used on the truck

¶56    Second, Lynch argues that appellate counsel should have raised a claim that trial counsel were ineffective for failing to "independently evaluate how the zip ties were placed on the truck." As for prejudice, Lynch tethers this claim into trial counsel's failure to examine the truck. According to Lynch, had trial counsel examined the truck, "counsel would have learned that the truck's hood was not actually 'faulty.'"

¶57    Lynch has not demonstrated that appellate counsel omitted a claim that "probably would have resulted in reversal on appeal." *See Kell*, 2008 UT 62, ¶ 42 (citation and internal quotation marks omitted). As previously discussed, the record contains several sworn statements demonstrating that the truck's hood did not latch properly. *Supra* ¶ 50. And Lynch's support for his claim that the truck hood did latch properly is based solely on statements from Steed's affidavit detailing his 2012 examination of the truck. Again, Steed and Warren examined Lynch's truck several years after Lynch's direct appeal, and Lynch has not demonstrated that his truck was in the same physical condition in 2012 as it was when it was initially found in 2007. *Supra* ¶ 48. Aside from Steed's affidavit, Lynch has not proffered anything demonstrating that raising this issue "probably would have resulted in reversal on appeal." *See Kell*, 2008 UT 62, ¶ 42 (citation and internal quotation marks omitted). Because Lynch fails to show a reasonable probability of reversal on appeal, this claim of ineffective assistance of appellate counsel fails. *See id.*

c.    How the zip ties were found at the crime scene

¶58    Third, Lynch argues that appellate counsel should have raised a claim that trial counsel were ineffective for failing to "independently evaluate how the zip ties were . . . found at the crime scene."

¶59    Lynch appears to be arguing that counsel were ineffective for not asserting that the zip ties were actually discovered somewhere other than the crime scene. However, during trial, multiple witnesses described seeing the zip ties in the roadway at the crime scene, and the jury was presented with photographs from the crime scene showing several zip ties lying in the roadway. Consequently, we conclude that this claim would not have been "obvious from the trial record." *See Kell*, 2008 UT 62, ¶ 42 (citation and internal quotation marks omitted).

¶60    And in any event, even if we were to assume appellate counsel performed deficiently in failing to raise this claim, Lynch has not shown prejudice, because he has not shown that raising the claim "probably would have resulted in reversal on appeal." *See id.* (citation and internal quotation marks omitted). Again, Lynch has not asserted that reversal on appeal was likely if appellate counsel had raised this claim, let alone explained why. Accordingly, Lynch has failed to carry his burden of establishing that appellate counsel was ineffective for failing to raise this claim. *See Ross v. State*, 2012 UT 93, ¶ 24, 293 P.3d 345.

¶61    We conclude that the postconviction court correctly granted the State's motion for summary judgment on Lynch's zip-tie claims.

3.    The potential witnesses

¶62    Next, Lynch argues that appellate counsel rendered ineffective assistance by failing to claim that trial counsel were ineffective for failing to follow up with two potential

witnesses—Maxwell and Ashe—and that trial counsel's "failure to contact or follow up with Maxwell or Ashe fell below professional standards of assistance." Again, Lynch contends that on direct appeal "appellate counsel never pointed to [trial] counsel's investigative deficiencies." As previously discussed, Lynch's claim regarding Ashe was raised and addressed during the new-trial proceedings. *See supra* ¶¶ 38–41. Therefore, we will only consider Lynch's claim regarding Maxwell.

¶63   With respect to Maxwell, Lynch argues that appellate counsel should have raised a claim that trial counsel were ineffective for failing to follow up with Maxwell, who submitted a sworn witness statement asserting that on the afternoon Victim was killed, he "heard a loud noise—like a[] . . . truck that had hit a speed bump or a pothole. I looked toward the road [and] saw what I think was a large red truck driving by." According to Lynch, trial counsel performed deficiently because although trial counsel "cross-examined Deputy Anderson regarding the red truck, . . . without Maxwell's own testimony regarding what he saw, [trial] counsel could do nothing beyond vaguely suggesting the testimony's existence."

¶64   "To determine whether appellate counsel's decision not to raise this claim prejudiced [Lynch], we must evaluate trial counsel's actions to determine if the claim 'probably would have resulted in reversal on appeal.'" *See Hamblin v. State*, 2015 UT App 144, ¶ 15, 352 P.3d 144 (quoting *Kell v. State*, 2008 UT 62, ¶ 42, 194 P.3d 913). To demonstrate that trial counsel performed deficiently, Lynch "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland v. Washington*, 466 U.S. 668, 689 (1984) (citation and internal quotation marks omitted). We therefore must determine if "a rational basis for counsel's performance can be articulated, and if so, we will assume counsel acted competently." *Hamblin*, 2015 UT App 144, ¶ 16 (citation and internal quotation marks omitted). To "eliminate the

distorting effects of hindsight," we "evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

¶65   The record indicates that trial counsel cross-examined both Detectives Anderson and Adamson about Maxwell and the red truck. And during opening statement and closing argument, trial counsel highlighted the State's failure to investigate other potential leads, including the red truck observed by Maxwell. For example, during opening statement, trial counsel stated:

> At this same time there are witnesses that hear a loud bump. However, there are also witnesses who witnessed trucks—a red truck, a diesel truck, a white truck with lettering on it and a phone number—all kinds of different things.
>
> What you're not going to hear is what the officers did to follow up on those. You're going to hear evidence about people who did come forward and said, we saw a white truck, two males in it, they looked like two Hispanic males. There are a lot of landscaping trucks in this area. They go back and forth, look for one where these men match this description. Again, no follow-up.

¶66   Although trial counsel likely could have further investigated Maxwell or called him to testify at trial, trial counsel may well have made a reasonable tactical choice not to do so. "The Sixth Amendment [to the United States Constitution] does *not* require counsel to . . . fully investigate every potential lead." *Menzies v. State*, 2014 UT 40, ¶ 183, 344 P.3d 581 (emphasis in original). "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691; *see also Menzies*, 2014 UT 40, ¶ 183. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the

limitations on investigation." *Strickland*, 466 U.S. at 690–91; *see also State v. Montoya*, 2004 UT 5, ¶ 24, 84 P.3d 1183 ("Although failure to investigate may, in some cases, satisfy the [deficient-performance element] of the *Strickland* test, it is within counsel's discretion to make reasonable decisions regarding the extent to which particular investigations are necessary."). "An attorney can avoid activities that appear distractive from more important duties" and is "entitled to . . . balance limited resources in accord with effective trial tactics and strategies." *Harrington v. Richter*, 562 U.S. 86, 107 (2011) (citation and internal quotation marks omitted). In this case, trial counsel, with their limited time and resources, could reasonably have seen little value in tracking down a witness who did not actually observe the incident, but who only saw a red truck in the vicinity. Instead, trial counsel could have reasonably chosen to highlight the fact that investigators had not pursued certain leads, including Maxwell's lead about the red truck, and to use that information to suggest that the State's investigation was incomplete. We conclude that this strategy was not objectively unreasonable and that trial counsel did not perform deficiently by refraining from further investigating Maxwell or calling him to testify at trial.

¶67   We also note that beyond Lynch's bare assertion that "counsel's further investigation into different explanations of the events might well have borne fruit," Lynch has not provided a description as to what Maxwell would have testified to at trial or explained how that testimony "probably would have resulted in reversal on appeal." *See Kell*, 2008 UT 62, ¶ 42 (citation and internal quotation marks omitted). Indeed, we agree with the State that "Lynch's claim about [Maxwell] is ultimately speculative." *See State v. Munguia*, 2011 UT 5, ¶ 30, 253 P.3d 1082 ("[P]roof of ineffective assistance of counsel cannot be a speculative matter but must be a demonstrable reality." (citation and internal quotation marks omitted)). At its core, Lynch's argument is essentially that, notwithstanding all of the evidence linking him and his truck to the collision with Victim, a jury

would have acquitted Lynch if it had simply heard that someone in the area heard "a loud noise like [a] . . . truck . . . had hit a speed bump or a pothole" and saw "a large red truck driving by" around the time of the collision. We are not persuaded, nor is it probable that the jury would have been.

¶68 Because a claim that trial counsel were ineffective in this regard would not have likely resulted in reversal on appeal, Lynch was not prejudiced by appellate counsel's failure to raise it. *See Kell*, 2008 UT 62, ¶ 42. Consequently, the postconviction court correctly granted the State's motion for summary judgment on this claim. *See Honie v. State*, 2014 UT 19, ¶ 28, 342 P.3d 182.

¶69 In sum, we conclude that the postconviction court correctly granted the State's motion for summary judgment on all of Lynch's ineffective-assistance claims. *See id.*

## II. Newly Discovered Evidence

¶70 Lynch contends that the postconviction court "erred when it held that newly discovered evidence was insufficient to demonstrate that no reasonable trier of fact could have found [him] guilty of the charged offense." "We review an appeal from an order dismissing or denying a petition for post-conviction relief for correctness without deference to the lower court's conclusions of law." *Taylor v. State*, 2007 UT 12, ¶ 13, 156 P.3d 739 (citation and internal quotation marks omitted).

¶71 Under the PCRA, a petitioner is entitled to relief based on "newly discovered material evidence" if (1) neither the petitioner nor his counsel knew of, or could have discovered through the exercise of reasonable diligence, the evidence before or at the time of trial; (2) the material evidence is not merely cumulative of evidence already known; (3) "the material evidence is not merely impeachment evidence"; and (4) "viewed with all the other evidence, the newly discovered material

evidence demonstrates that no reasonable trier of fact could have found the petitioner guilty of the offense or subject to the sentence received."[12] Utah Code Ann. § 78B-9-104(1)(e) (LexisNexis 2012).

¶72    In support of his newly discovered evidence claim, Lynch submitted affidavits from two independent investigators—Terry Steed and Benjamin Warren—relating the findings of their 2012 investigation. According to Lynch, this newly discovered evidence "call[s] into serious question two of the State's strongest pieces of evidence"—the zip ties and the tow hook—and "creates reasonable doubt as to Lynch's guilt."

¶73    In his affidavit, Warren attested that he and Steed had met with Detective Anderson in February 2012 and that Detective Anderson had told them that "there were no zip ties found at the actual scene" and that "the zip ties were used by the

---

12. Citing *Julian v. State*, 2002 UT 61, 52 P.3d 1168, Lynch asserts that newly discovered evidence must be "such as to render a different result probable on retrial." *See id.* ¶ 14. But *Julian* described the "law in effect prior to the enactment of the PCRA." *See id.* ¶ 13. Under the pre-PCRA standard, a petitioner was entitled to relief only if there was a "substantial likelihood of a different result on retrial." *See id.* ¶ 21; *see also id.* ¶ 17 ("[O]ur pre-PCRA case law requires that newly discovered evidence demonstrate more than merely rendering a different result probable at retrial, but less than [ensuring] that no reasonable trier of fact could have found the petitioner guilty of the offense."). Under the current PCRA standard, however, a petitioner can obtain relief only if "the newly discovered material evidence demonstrates that *no reasonable trier of fact could have found the petitioner guilty of the offense*." Utah Code Ann. § 78B-9-104(1)(e)(iv) (LexisNexis 2012) (emphasis added). Consequently, Lynch's reliance on *Julian* is misplaced.

police officers, themselves, while transporting the Truck from its initial location to the Evidence Center." According to Warren, an Officer Ipson had "fortified Detective Anderson's comments, and agreed that the zip ties were used by the police officers and not recovered from the scene of the accident."

¶74 Steed's affidavit corroborated Warren's statements regarding Detective Anderson's and Officer Ipson's comments about the zip ties. Steed further attested that the truck's front grille was intact and that there "was no physical evidence suggesting that the front grille had sustained any damage, or that it had been broken in any way." With respect to the truck's hood latch, Steed attested that it "appeared to work perfectly for the age of the vehicle" and that "there was no evidence of a malfunction." Steed also attested that "no 'tow hook or tow ring' could be located on the Truck's front end." Steed stated that it was his professional opinion that "the physical characteristics of the Truck that [he and Warren] investigated . . . do not correlate with the auto-pedestrian fatality to which the Truck is allegedly linked."

¶75 The postconviction court held an evidentiary hearing on Lynch's newly discovered evidence claim. At the hearing, Steed initially repeated the claims from his affidavit. He testified that Detective Anderson had told him that there were no "zip-ties found at the scene" and that officers "brought the zip-ties with [them]" and "attached them to the vehicle in order to transport the vehicle to the evidence facility." Like Warren, Steed testified that "Officer Ipson . . . fortified Detective Anderson's comments and agreed that the zip-ties were used by the police officers and not recovered from the scene of the accident." Steed further testified that he "could not find anything that would have been conducive to needing zip-ties to hold anything in place or to otherwise be used" on Lynch's truck and that he "found the hood latch [on Lynch's truck] to be in good, working condition."

¶76   On cross-examination, however, Steed clarified that "it was not easy to make the hood close" and that "this was a typical hood latch for an older truck," "[m]eaning that it didn't work as well as it should." Steed admitted that he never drove the truck and had no "first-hand knowledge of how the hood performs when it's driven at high speeds." Steed further testified that although he "could not seem to locate an area on the front of the [truck] that would be consistent with needing a zip-tie attached for whatever reason," there was "absolutely" a "place on the front of the [truck] to which a zip-tie could have been attached." Steed suggested that "the grille, itself, could have had 30 or 40 of them on there." On redirect examination, Steed testified that he could not say "in all honesty and without any reservation, that it was absolutely [Detective Anderson]" who said there "were no zip-ties at the actual scene."

¶77   Warren also testified at the hearing. He testified that he had examined the truck with Steed "to determine where some tie clips could have been attached on the truck and if there was a tow hook on the truck." According to Warren, he "didn't see anything where zip-ties could have been attached." Warren further testified that Detective Anderson had mentioned that the zip ties "weren't found on the scene" and that officers had "used those to attach parts of the truck from the scene." According to Warren, Detective Anderson told him "that they had actually used those zip-ties on the truck at the scene of the accident."[13] On cross-examination, Warren testified that he had never driven the truck and had no "first-hand knowledge of how the hood would perform if the truck was driven at 30 miles an hour." He also acknowledged that "it's possible the zip-ties could have been attached to the grille" of the truck but that he "wouldn't see any purposeful reason to use a zip-tie." Warren further

_____

13. This statement is inconsistent with the record; the truck was not found at the scene of the collision.

acknowledged that he did not have "any real basis of knowledge about how this truck works or what it does and doesn't need."

¶78    Detective Anderson testified at the hearing that the zip ties "were in the collision path" and "had the shape of whatever they were around" so it was his opinion "at the time, that they, probably, came off the vehicle, itself, or something attached to the vehicle at the time" and that they "would be related to the crash." He testified that "there [were] a couple of opinions throughout the course of the investigation of possibilit[ies] for the zip-tie location," including

> that the zip-ties could have . . . been ran through the front portion of the underside of [a] hard-ducking component of the underside of the hood, such as the front clip. It also was believed that it possibly could have been attaching the grille, itself, to something inside of the vehicle, more secure, simply just because of how loose things were on the front of the vehicle.

Detective Anderson further testified that he was sure that the zip ties "were found at the scene of the crash," that there were about "10 to 15 people" at the scene when he arrived, and that he was never alone at the scene. Regarding his alleged conversation with Steed and Warren in 2012, Detective Anderson stated that he had talked to Steed but that he had "never had any conversations with Mr. Warren" who was "pretty much, doing all the work." Detective Anderson testified that Steed never asked him about the discovery of zip ties at the scene and that he never said there were no zip ties at the scene. He further testified that no one involved in the 2012 investigation drove the truck. Lastly, he authenticated several photographs taken at the scene that showed zip ties lying in the roadway.

¶79    Officer Ipson testified as well. He testified that he never "visited [the] crime scene," that he was not "involved in the

direct collection of evidence," and that his involvement in the case only began "[o]nce the vehicle came into [the] warehouse." He further testified that he was present when Steed and Warren examined the truck in 2012, but that he never spoke with either Steed or Warren and that he never told "them how the evidence was collected at the crime scene" because he did not "know how they collected it at the crime scene." He also testified that neither Steed nor Warren drove the truck.

¶80 Finally, Detective Stewart, who was Detective Anderson's partner during the investigation, testified. According to Detective Stewart, neither he nor Detective Anderson was ever alone at the crime scene. Detective Stewart further testified that he had observed three black zip ties in the roadway at the crime scene and that he did not "know of any other officers bringing them with them" to the crime scene.

¶81 At the conclusion of the evidentiary hearing, the postconviction court ruled from the bench. The court determined that Lynch was "miles and miles" away from establishing that no reasonable trier of fact could have found him guilty given the newly discovered evidence. The court observed that the newly discovered evidence was "sworn testimony that . . . [the] lead investigator . . . perjured himself at trial and, in fact, that the evidence was [that] the zip-ties were not found at the scene." According to the court, taking Steed's and Warren's statements about the zip ties as true "would mean that all of the objective evidence, the photographs that were taken, were false." The court noted that it "found everybody quite credible" and that it did not "doubt that . . . Steed and the others, whatever they thought they heard, they heard. I don't think anybody is shading the truth." The court further noted that it "thought Mr. Steed, in particular, was quite credible," but that "[u]nfortunately, people mishear things."

¶82 The court then found that it was "beyond dispute that the zip-ties, that evidence, was observed in situ, by Detective

Anderson and others and photographed that day and, then, taken into evidence, into a secure facility." According to the court, the idea that Detective Anderson "openly admitted" to "representatives of Mr. Lynch" to "committing a major felony" "defie[d] common sense." The court observed that it was "[i]mpossible to believe that [Detective Anderson] told [Steed and Warren] the truck was removed from the scene" by police, because "[e]verybody knows that wasn't the case." The court further observed that it did not matter whether the zip ties were used to tie down the hood of Lynch's truck because there was "overwhelming objective evidence" that the zip ties were found at the scene of the crime and with Lynch's truck. Finally, the court found the implication that detectives had committed perjury and planted evidence to be "nothing but theory" and "irrelevant" because there was not "a shred of evidence . . . that that's what occurred." Based on the foregoing, the court denied Lynch's PCRA petition "in its entirety."

¶83   To qualify as newly discovered evidence meriting relief, Steed's and Warren's affidavits and testimony must, "when considered with existing evidence, demonstrate that no reasonable trier of fact could have reached the jury's conclusion." *Taylor v. State*, 2012 UT 5, ¶ 26, 270 P.3d 471. Although certain portions of Steed's and Warren's affidavits and testimony are favorable to Lynch, they are not so compelling as to demonstrate that no reasonable trier of fact could have found Lynch guilty.

¶84   To begin with, regarding Detective Anderson's alleged recantation concerning the zip ties, Steed's own testimony at the hearing was contradictory. Steed initially testified that Detective Anderson had told him no zip ties were found at the crime scene, but he later admitted that he could not say "in all honesty and without any reservation, that it was absolutely [Detective Anderson]" who said there "were no zip-ties at the actual scene." Detective Anderson's and Officer Ipson's testimony also

contradicted Steed's testimony on this point. Detective Anderson specifically denied telling Steed that "there were no zip-ties found at the scene" or that "the zip-ties were used by police officers to transport the vehicle." And while Steed testified that "Officer Ipson . . . fortified Detective Anderson's comments and agreed that the zip-ties were used by the police officers and not recovered from the scene of the accident," when Officer Ipson testified, he stated that he never "visited [the] crime scene," that he was not "involved in the direct collection of evidence," and that his involvement in the case began "[o]nce the vehicle came into [the] warehouse." Moreover, Warren's testimony that Detective Anderson told him "that they had actually used those zip-ties on the truck at the scene of the accident" was contradicted by the undisputed evidence that investigators did not find Lynch's truck at the scene of the crime. Rather, investigators found Lynch's truck several days after the crime in an abandoned garage.

¶85    As to the underlying claim that the zip ties were planted, Detective Anderson testified that he was sure that the zip ties "were found at the scene of the crash," that there were about "10 to 15 people" at the scene when he arrived, and that he was never alone at the scene. Detective Stewart verified that neither he nor Detective Anderson was ever alone at the crime scene. Detective Stewart also testified that he had observed three black zip ties in the roadway at the scene and that he did not "know of any other officers bringing them with them" to the scene." This testimony was supported by objective evidence in the form of photographs from the crime scene showing several zip ties in the roadway while the investigation was occurring in the background.

¶86    In light of the foregoing, we agree with the State that Steed's and Warren's testimony regarding Detective Anderson would have created, "at most, a credibility contest for the jury." However, "[a] jury could rationally disbelieve" Steed and

Warren "in view of other evidence" implicating Lynch, including Detective Anderson's testimony. *See Wickham v. Galetka*, 2002 UT 72, ¶ 18, 61 P.3d 978. Consequently, Lynch has not demonstrated that Steed's and Warren's affidavits and their testimonies regarding Detective Anderson are such that "no reasonable trier of fact could have found [Lynch] guilty." *See* Utah Code Ann. § 78B-9-104(1)(e)(iv) (LexisNexis 2012).

¶87 With regard to the use of the zip ties and the truck's hood, both Steed and Warren equivocated about key aspects of their claims when they testified at the evidentiary hearing. For example, while Steed initially testified that he "found the hood latch [on Lynch's truck] to be in good, working condition," he later clarified that "this was a typical hood latch for an older truck," "[m]eaning that it didn't work as well as it should." And although Steed testified that he "could not find anything that would have been conducive to needing zip-ties to hold anything in place or to otherwise be used" on Lynch's truck, he later acknowledged that there was "absolutely" a "place on the front of the [truck] to which a zip-tie could have been attached." Indeed, Steed suggested that "the grille, itself, could have had 30 or 40 of them on there." Warren's testimony was similarly equivocal. Warren initially testified that he "didn't see anything where zip-ties could have been attached." But on cross-examination he acknowledged that "it's possible the zip-ties could have been attached to the grille" and that he did not have "any real basis of knowledge about how this truck works or what it does and doesn't need." And both Steed and Warren acknowledged that they had not driven the truck and that they had no "first-hand knowledge of how the hood performs when it's driven at high speeds."

¶88 We agree with the State that "this testimony does not prove that no reasonable juror could have found Lynch guilty." To begin with, as the State correctly observes, "[t]he issue in this case isn't whether the hood stays latched when the truck is

standing still. Rather, the issue is whether the hood stays latched when it is driven at high speeds." Here, both Steed and Warren admitted that they had no personal knowledge regarding "how the hood performs when it's driven at high speeds." By contrast, the owner of the garage where Lynch stored his truck submitted an affidavit attesting that at least on one occasion, the truck's hood had blown open while Lynch was driving it. And the truck's previous owner signed an affidavit attesting that "while he owned the pickup" "the hood latch was not working properly." Turning to the zip ties, neither Steed's nor Warren's testimony definitively established that there was no need for zip ties to secure the truck's hood, and both Steed and Warren acknowledged that the zip ties could have been attached to the truck's grille. Moreover, as the State observes, "even if the zip ties were not actually used to secure the hood itself," there was evidence demonstrating that "there were zip ties in the road and that they matched [a] zip tie fragment found in Lynch's truck." Thus, the zip ties "were on the truck for *something*." (Emphasis in original.)

¶89　Finally, regarding the tow hook, although Steed and Warren testified that they did not see a tow hook on Lynch's truck in February 2012, Lynch has failed to demonstrate that his truck was in the same condition in 2012 as it was in 2007. And in any event, the State never alleged that the tow hook was the only possible source for Victim's leg injury. Indeed, at trial, Detective Anderson testified that there was a splash guard or spoiler on the front of the truck which he thought might have caused Victim's leg injury. And DNA from a female was found on the truck's spoiler.

¶90　We conclude that a reasonable jury could have chosen to disregard Steed and Warren's proffered testimony regarding the zip ties and the truck's hood and convict Lynch based on the other evidence presented at trial. Consequently, Lynch has not demonstrated that Steed's and Warren's affidavits and

testimony—when "viewed with all the other evidence"—are such that "no reasonable trier of fact could have found [Lynch] guilty." *See* Utah Code Ann. § 78B-9-104(1)(e)(iv). We therefore conclude that the postconviction court did not err in denying Lynch's newly discovered evidence claim. *See Taylor v. State*, 2007 UT 12, ¶ 13, 156 P.3d 739.

CONCLUSION

¶91    We conclude that the postconviction court correctly granted the State's motion for summary judgment on Lynch's ineffective-assistance claims and that the court correctly denied Lynch's newly discovered evidence claim. Accordingly, we affirm.

———————